IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ISSAC VICENTE,

        Petitioner,               2: 09 - cv - 2248 - GEB TJB

    vs.

MIKE McDONALD,

        Respondent.        ORDER, FINDINGS AND

                                     RECOMMENDATIONS

_____/

      Petitioner, Issac Vicente, is a state prisoner proceeding with a *pro se* petition for writ of

habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner is currently serving a sentence of fifteen

years to life in prison after a jury convicted him on one count of discharging a firearm at an

occupied motor vehicle (Cal. Penal Code § 246) with an enhancement for committing the crime

for the benefit of a criminal street gang (Cal. Penal Code § 186.22(b)(1)).  Petitioner raises

twelve claims in this federal habeas petition; specifically: (1) the prosecutor used peremptory

strikes to remove three jurors based on their race, in violation of the Equal Protection Clause

("Claim I"); (2) insufficient evidence exists with regard to a finding that Petitioner was a member

of a criminal street gang due to lack of evidence of the group's "primary activities" ("Claim II");

(3) the jury instruction regarding "primary gang activity" was in error because there was no

evidence of the possible "primary activities" given in the instruction ("Claim III"); (4) insufficient evidence exists with regard to a finding that Petitioner was a member of a criminal street gang due to lack of evidence of the group's "pattern of criminal gang activity" ("Claim IV"); (5) due to the jury instruction regarding "pattern of criminal activity," there was insufficient evidence of a "pattern of criminal activity" ("Claim V"); (6) insufficient evidence exists from which the jury could conclude the crimes were committed with the requisite intent and for the benefit of, at the direction of, or in association with a criminal street gang ("Claim VI"); (7) the failure of the trial court to give a jury instruction with regard to an admission by the Petitioner that he was a gang member was not harmless ("Claim VII"); (8) use of Petitioner's statement that he was a gang member violated Petitioner's *Miranda* rights ("Claim VIII"); (9) the evidence was insufficient for a conviction for discharging a firearm at an occupied motor vehicle ("Claim IX"); (10) failure to instruct the jury as to the lesser included offense of attempt violated Petitioner's right to due process ("Claim X"); (11) the failure of the jury to follow the trial court's instructions denied Petitioner his right to an impartial jury ("Claim XI"); and, (12) the trial court's refusal to dismiss a juror who spoke with a witness denied Petitioner his right to an impartial jury ("Claim XII").  For the reasons stated herein, the federal habeas petition should be denied.

## I.  FACTUAL BACKGROUND[1]

*The Offense*

The offense involved a daylight shooting in the parking lot of a Sidewalk Pizza restaurant in Sacramento on March 2, 2006, around 5:30 p.m. There were two witnesses: J.J., a Sidewalk Pizza customer who had momentarily stepped outside the restaurant for a cigarette; and R.W., who was working as the restaurant's cashier and saw the event unfold out the front window.

---

[1]  The factual background is taken from the California Court of Appeal, Third Appellate District decision on direct appeal from September 2008 and filed in this Court by Respondent on March 17, 2010 as Exhibit A to his answer (hereinafter referred to as the "Slip Op.").

That unfolding took place as follows. Near where J.J. was standing outside the restaurant, a white Camaro, with a nonvisible, flipped-down rear license plate, had parked in backwards, i.e., facing into the parking lot. The passenger in the Camaro, later identified as [Petitioner's co-defendant]Tomas, had just gotten out of the car when a white Ford, driven by a Hispanic male, drove slowly by the Camaro. The driver of the Ford remarked to Tomas, "What's up," and displayed a large handgun. The two men argued.

As the Ford drove through the parking lot, Tomas picked up rocks and threw them at the car. Tomas continued walking alongside the Ford and yelling at its driver (through the passenger side window), all the way to the parking lot exit where the Ford stopped.

While Tomas was arguing with the Ford's driver, a man, later identified as Vicente (who is Tomas's brother), emerged from the driver's seat of the Camaro and retrieved a handgun from the trunk. Crouching down, Vicente snuck up behind the Ford's rear passenger side and fired two or three shots into the car. J.J. saw Vicente pull the trigger while just outside the Ford, and he heard the gunshots. R.W. said that Vicente reached into the passenger window of the Ford (to about wrist level) with a gun in his hand, and he heard two to three gunshots. During the shooting, Tomas was one or two feet "right behind" Vicente.

The Ford turned left out of the parking lot, and drove away as if nothing had happened. Tomas and Vicente ran back to the Camaro, taking off in the same direction as the Ford. Before leaving the parking lot, however, the Camaro stopped, and Tomas flopped out of the passenger side and grabbed things off the ground at the shooting site.

R.W. called 911. Officers apprehended defendants a short time later in the vicinity. The defendants and their car were then identified.

A criminalist testified that gunshot residue found on Vicente indicated he either fired a weapon or was less than two or three feet in front of a weapon fired at him. Gunshot residue on Tomas indicated he either fired a weapon, handled a fired weapon or fired ammunition, or was in the vicinity of a firearm that was fired.

*The Gang Enhancement*

A gang expert, Detective R., testified that Sureños and Norteños are rival Hispanic street gangs. Sureños is an umbrella term, and a particular group of Sureños that identifies with some geographical area is considered a subset. Sureños identify with the color blue and the numbers 13 and three.

/ / /

3

About a month before the present offense, Vicente told Detective R. that he was a Sureño. Tomas told a probation officer that he too was a Sureño and affiliated with a Sureños gang, the Sur Town 916. Neither officer was aware of the Sur Town 916 subset. Support for these statements from defendants and for Detective R.'s opinion that the defendants were Sureños street gang members came from tattoos, monikers (gang nicknames), and photos, as well as hairstyles and clothing on the night of the offense and evidence showing that defendants had written at least a portion of "SUR" in large letters in their holding cell during the present trial.

Detective R. opined that the primary activities of the Sureños street gang include, among its more serious crimes, "felonious assault." He detailed the facts of two previous shootings of pedestrians done by two different Sureño gang members.

Detective R. also explained the importance of respect in gang culture. He opined that the present offense had the potential to benefit the defendants' gang and their status within it.

A defense gang expert testified that Norteños and Sureños are identities, rather than gangs, although specific gangs may operate under those identities.

## II.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

An application for writ of habeas corpus by a person in custody under judgment of a state court can only be granted for violations of the Constitution or laws of the United States.  *See* 28 U.S.C. § 2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing *Engle v. Isaac*, 456 U.S. 107, 119 (1982)). Petitioner filed this petition for writ of habeas corpus after April 24, 1996, thus the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") applies.  *See Lindh v. Murphy*, 521 U.S. 320, 326 (1997).  Under AEDPA, federal habeas corpus relief is not available for any claim decided on the merits in the state court proceedings unless the state court's adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court.  *See* 28 U.S.C. 2254(d); *Perry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v. Taylor*, 529 U.S. 362, 402-03 (2000).

4

1    In applying AEDPA's standards, the federal court must "identify the state court decision

2 that is appropriate for our review." *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005).

3 "The relevant state court determination for purposes of AEDPA review is the last reasoned state

4 court decision." *Delgadillo v. Woodford*, 527 F.3d 919, 925 (9th Cir. 2008) (citations omitted).

5 "Where there has been one reasoned state judgment rejecting a federal claim, later unexplained

6 orders upholding that judgment or rejecting same claim rest upon the same ground." *Ylst v.*

7 *Nunnemaker*, 501 U.S. 797, 803 (1991).  To the extent no such reasoned opinion exists, courts

8 must conduct an independent review of the record to determine whether the state court clearly

9 erred in its application of controlling federal law, and whether the state court's decision was

10 objectively unreasonable.  *Delgado v. Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000). "The

11 question under AEDPA is not whether a federal court believes the state court's determination

12 was incorrect but whether that determination was unreasonable—a substantially higher

13 threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410).

14 "When it is clear, however, that the state court has not decided an issue, we review that question

15 *de novo*." *Reynoso v.Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006) (citing *Rompilla v. Beard*,

16 545 U.S. 374, 377 (2005)).

17    The first step in applying AEDPA's standards is to "identify the state court decision that

18 is appropriate for our review." *See Barker*, 423 F.3d at 1091.  Petitioner raised his claims on

19 direct appeal to the California Court of Appeal, Third District, which denied his claims in a

20 reasoned decision. *See* Slip Op.  Petitioner also raised his claims in a petition for review to the

21 California Supreme Court. *See* Lodged Doc. No. 4 (Petition for Review), at 5.  The petition for

22 review was summarily denied. *Id.*  Because the California Supreme Court summarily denied

23 Petitioner's petition for review, this court looks through that decision to the last reasoned state

24 court decision. *Ylst*, 501 U.S. at 806.  Therefore, the state court decision that is appropriate for

25 review is the decision of the California Court of Appeal.

26 / / /

III.  ANALYSIS OF PETITIONER'S CLAIMS

1.  Claim I

In Claim I, Petitioner asserts that the prosecutor improperly struck three potential jurors because they were of Hispanic descent; specifically Mr. Echivaria, Mr. Cordoza, and Ms. Galvez. Purposeful racial discrimination in selection of the petit jury violates a defendant's right to equal protection because it denies him the protection that a trial by jury is intended to secure. *Batson v. Kentucky*, 476 U.S. 79, 88 (1986); *see also Strauder v. West Virginia*, 10 Otto 303, 100 U.S. 303 (1880) (invalidating a state statute that provided that only white men could serve as jurors); *Martin v. Texas*, 200 U.S. 316, 321 (1906).  Under *Batson*, the use of peremptory challenges to remove a prospective juror because of that juror's race or ethnicity is unconstitutional discrimination.  *Batson*, 476 U.S. at 89 ("[T]he Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant.")  To establish a *Batson* claim, the defendant must first make a prima facie showing that a challenge was made on an impermissible basis, such as race.  *Batson*., 476 U.S. at 96; *see also Johnson v. California*, 545 U.S. 162, 170-71 (2005).  To establish a prima facie case, a petitioner must show that (1) the prospective juror is a member of a cognizable racial group, (2) the prosecutor used a peremptory strike to remove the juror, and (3) the totality of the circumstances raises an inference that the strike was motivated by race.  *See Boyd v. Newland*, 467 F.3d, 1139, 1143 (9th Cir. 2006) (citing *Batson*, 476 U.S. at 96).[2]

---

[2]  If the defendant can make such a prima facie showing, the burden shifts to the State to show a neutral explanation for the peremptory challenge. *Batson*, 476 U.S. at 97-98.  Where the State offers a race-neutral explanation for the challenge, the trial court decides whether the defendant has proved the prosecutor's motive for the challenge was purposeful racial discrimination.  *See Boyd*, 467 F.3d at 1139; *see also Batson*, 476 U.S. at 98.  The opponent of the strike has the ultimate burden of persuasion regarding racial motivation.  *See Purkett v. Elem*, 514 U.S. 765, 768 (1995) (per curiam).  Because the California Court of Appeal made a reasonable determination that Petitioner failed to make a prima facie showing that the peremptory strikes in question were racially motivated, it is unnecessary to move to the second and third steps of the *Batson* analysis.

The California Court of Appeal determined that the trial court properly concluded

Petitioner failed to make a prima facie case:

> Defendants contend they were denied their state constitutional right
> to a representative jury and their federal constitutional right to
> equal protection when the prosecutor peremptorily challenged three
> apparent Hispanic jury panel members, and the trial court
> concluded that defendants had not made a prima facie showing of
> group bias. (*People v. Wheeler* (1978) 22 Cal.3d 258, 276-277
> (*Wheeler*); *Batson v. Kentucky* (1986) 476 U.S. 79, 86 [90 L.Ed.2d
> 69] (*Batson* ).) We disagree with defendants' contention.
>
> Under *Wheeler* and *Batson*, the use of peremptory challenges to
> remove a prospective juror because of that juror's race or ethnicity
> is unconstitutional discrimination. (*Wheeler*, *supra*, 22 Cal.3d at
> pp. 276-277; *Batson*, *supra*, 476 U.S. at pp. 86-87.)
>
> To establish a *Wheeler*/*Batson* claim, three steps are involved.
> First, a defendant must make a prima facie case by showing that
> the "'totality of the relevant facts'" gives rise to a discriminatory
> inference. (*Johnson v. California* (2005) 545 U.S. 162, 168 [162
> L.Ed.2d 129], quoting *Batson*, *supra*, 476 U.S. at p. 94.) If that is
> done, the People must then show race-neutral reasons for the
> challenge. (*Johnson*, *supra*, at p. 168.) And if that is done, the trial
> court must then decide whether purposeful racial discrimination
> has been proved. (*Ibid.*)
>
> Here, the trial court determined that defendants had not cleared the
> first hurdle-they had not made a prima facie case. "The trial court's
> determination that no prima facie showing of group bias has been
> made is subject to review to determine whether it is supported by
> substantial evidence. [Citation.] We examine the record of the voir
> dire and accord particular deference to the trial court as fact finder,
> because of its opportunity to observe the participants at first hand."
> (*People v. Jenkins* (2000) 22 Cal.4th 900, 993-994, fn. omitted.)
>
> Three prospective jurors with Hispanic surnames are at issue: Mr.
> C, Mr. E, and Ms. G, who were excused in that order.
>
> Mr. C grew up in Vallejo around "different gang members." His
> brothers were "affiliated" with neighborhood area-like gangs. He
> was not involved "in either side," and he said his experience would
> not affect his judgment in this case.
>
> Mr. E was an insurance adjuster who had previously worked as a
> bilingual assistant for a school district. Mr. E personally knew
> Vicente's counsel, Mr. Enriquez, who was a friend of Mr. E's
> parents. Mr. E and Mr. Enriquez had been at social functions
> together. Mr. E stated he could be fair to all sides; knowing Mr.
> Enriquez "shouldn't" affect his judgment, and he did not "think"

1           he would favor Mr. Enriquez's side.

2           Ms. G was not individually questioned by the trial court or by any party. The prospective jurors, however, had turned in

3           questionnaires which are not in the record.

4           After the prosecutor excused Ms. G, defendants made their *Wheeler* motion, arguing that the prosecutor was using peremptory

5           challenges to excuse "all the Hispanics." The prosecutor immediately responded that Ms. G "was White." The trial court

6           noted that Ms. G "had blonde hair and a fair complexion," and that she did not appear "to be obviously Hispanic."

7

8           The record supports the trial court's determination that defendants failed to make a prima facie showing. The prosecutor certainly could have challenged Mr. C and Mr. E for legitimate reasons.

9           (*People v. Farnam* (2002) 28 Cal.4th 107, 135.) Mr. C's brothers were affiliated with a gang, and Mr. E was personally friendly with

10          Vicente's counsel. That leaves Ms. G: blonde-haired, fair-complected Ms. G, whose first name was "Shari" and whose

11          surname the trial court described as "Spanish-sounding." (*See People v. Bonilla* (2007) 41 Cal.4th 313, 344 ["Where a prosecutor

12          is unaware of a prospective juror's group status, it logically follows he cannot have discriminated on the basis of that status"].) The

13          defendants described themselves as Hispanic/Mexican. On this record, we cannot say the trial court's determination of no prima

14          facie showing lacks substantial evidence.

15          Tomas additionally alleges, in passing, that a "'comparative analysis'"-i.e., comparing the voir dire responses of these three

16          excused prospective jurors with those of the other prospective jurors-would support the group bias claim. This allegation runs

17          into a thicket of procedural roadblocks. Defendants did not assert this point in the trial court. They have asserted this point only

18          summarily on appeal, without any argument. And our state Supreme Court has concluded that a comparative analysis is

19          inappropriate where a prima facie showing has not been made, because, without any reasons having been posited for the

20          peremptory challenges, there is "no fit subject for comparison." (*People v. Bell* (2007) 40 Cal.4th 582, 601.)

21

22   Slip Op. at 5-8.

23         The trial court began the questioning of prospective jurors by asking some general

24   questions to the venire as a group.  After introducing Petitioner and his counsel, Armando

25   Enriquez, the judge asked: "Does anybody recognize either Mr. Vicente or Mr. Enriquez?  Have

26   you ever seen or heard of either one of them before?"  Lodged Doc. No. 2 (Rep.'s Tr. of Voir

Dire [hereafter "V.D. Tr."]) at 16.  One prospective juror, Mr. Echivaria, recognized Enriquez as a friend of his parents and had been at social occasions where Petitioner's counsel was also present, though he did not know him well.  *Id.* at 16-17.  Echivaria did not believe his connection to Enriquez would make him favor Petitioner's case or affect his judgment.  *Id.* at 16-17.[3]

Later in the general questioning, the court asked the prospective jurors whether they had any experience with gangs, and specifically whether anyone was familiar with the Surenos gang.  *Id.* at 44-45.  A prospective juror, Mr. Cordoza, indicated that he was familiar:

> THE COURT: Mr. Cordoza, what's the basis of your experience?
>
> CORDOZA: Just growing up around the different gang members.
>
> THE COURT: Did you personally know people that were associated with one or more gangs?
>
> CORDOZA: Yeah.  Oh, yeah.  Never invovled in either side, but definitely aware of it.
>
> THE COURT: Anything about your experience that would affect your judgment in this case?
>
> CORDOZA: No.

*Id.* at 45.  The court then proceeded through the individual potential jury members with individual questions, some based on responses the prospective jurors had previously filled out.  When the court reached Cordoza, he related several instances in his life in which he had been close to criminal activity, including his brother's car being stolen from him at gun point, the rape of his previous girlfriend, and the murder of his best friend's father at a truck stop near Vallejo, California (a case of mistaken identity).  *Id.* at 67-68.  Cordoza stated that the perpetrators of the rape and the murder had been "brought to justice."  *Id.* at 68.  Cordoza believed he could be fair to all sides.  *Id.*

---

[3]  The individual questioning of Echivaria was innocuous.  Echivaria stated that he worked for the State, was previously a bilingual assistant with a local school district, had lived the same area for about thirty years, and was married with a two-year-old son.  V.D. Tr. at 72-73.

1    When the attorneys were given an opportunity to ask direct questions of the panel, neither

2  defense attorney asked any questions of Cordoza.  The Deputy District Attorney, Ms. Franklin,

3  asked Cordoza several questions regarding his relationship with gangs.  *Id.* at 96-99.

4         FRANKLIN (D.A.): Mr. Cordoza, you had what sounds like maybe
          is a unique experience growing up in the – I don't think at least

5         we've heard it from anyone else – you grew up in an area where
          gangs were around.  You grew up with people who were gang

6         members; am I right?

7         CORDOZA: True.

8  *Id.* at 96.  Franklin then asked Cordoza several questions about his relationship with and

9  knowledge of gangs.  Cordoza stated that he wasn't heavily affiliated with any particular gang

10  growing up, but that his brothers had been affiliated with certain areas, and he was "growing up

11  around that."  *Id.* at 97.  When asked how he was familiar with the terms "north" and "south" as

12  categorizing terms for gangs, Cordoza responded: "of course, just anybody growing up in our age

13  and around certain areas, you'd be blind to the fact that if you didn't know, you know, the gang

14  rivalries between Nortenos and Surenos."  *Id.* at 98.

15    Petitioner also challenges the prosecution's peremptory strike of Ms. Galvez.

16  Immediately after the prosecution used a peremptory strike against Ms. Galvez, a sidebar was had

17  in which Petitioner's counsel raised his *Batson* claim, alleging the prosecution was "taking out

18  all the Hispanics."  V.D. Tr. at 388.  Ms. Franklin, the prosecutor, responded that Galvez "was

19  White," *id.*, and the trial court noted Galvez "had blonde hair and a fair complexion."  *Id.* at 389.

20  While admitting that Galvez may be Hispanic, the trial court, who was in the best position to

21  make a determination on the point, found Galvez "[did] not appear to me to be obviously

22  Hispanic."  *Id.* at 391.

23    The California Court of Appeal reached a reasonable conclusion when it determined that

24  there were valid reasons for the prosecution to strike both Echivaria and Cordoza, and that the

25  totality of the circumstances did not raise an inference that the strike was motivated by race.  *See*

26  *Boyd*, 467 F.3d at 1143.  Echivaria was familiar with Petitioner's counsel, a friend of his father,

1  and had been around him in social settings.  While Echivaria still believed that he could be fair, it

2  was not unreasonable for the prosecution to use a peremptory strike to remove him from the jury

3  and replace him with someone who was not affiliated with any of the participants in the case.

4  Cordoza had a unique relationship with and knowledge of gangs amongst the prospective jurors

5  and was familiar with the Surenos-Nortenos rivalry, the very rivalry likely involved in this case.

6  It was not unreasonable for the prosecutor to use a peremptory strike against him for fear he

7  might bring his outside knowledge of gangs and their practices into the jury room,[4] especially in

8  a case where the charge which carried the most serious penalty was the gang enhancement.  *See*

9  Cal. Penal Code § 186.22(b)(4).[5]  Furthermore, it is a reasonable conclusion that Petitioner did

10  not establish a prima facie case with respect to Ms. Galvez because Petitioner could not establish

11  that she, despite her surname, was Hispanic.  Alternatively, even if Petitioner could show that

12  Galvez was Hispanic, the Court of Appeal was reasonable when it determined the totality of the

13  circumstances did not raise an inference that the strike was motivated by race.  Though her

14  surname may have indicated she was Hispanic, the trial court's determination that Galvez did not

15  appear to be Hispanic supported a finding that the strike was not motivated by race.

16      The Court of Appeal's determination was not contrary to, or an unreasonable application

17  of, *Johnson v. California*, 545 U.S. 162 (2005).  In *Johnson*, the Supreme Court discussed how a

18  defendant can show a prima facie case.  The Court concluded that where 3 of 43 possible jurors

19  were black, and the prosecutor used 3 of his 12 peremptory challenges to remove the 3 potential

20  black jurors, the defendant had successfully established a prima facie case under *Batson*.  *Id.* at

21  164, 173.  The Court cautioned that when determining whether a prima facie case exists, "[t]he

22

23      [4]  At least two other prospective jurors expressed a connection to gang members through
    their work within jails and prisons.  One of the prospective jurors was removed through a

24  peremptory challenge by Petitioner's co-defendant's counsel, the other was also removed by the
    prosecution.  V.D. Tr. at 109:10-11, 135:14-15.

25

26      [5]  Petitioner faced a maximum prison sentence of seven years for the underlying felony.
    Cal. Penal Code § 246.  The gang enhancement resulted in a sentence of fifteen years to life in
    prison.

inherent uncertainty present in inquiries of discriminatory purpose counsels against engaging in needless and imperfect speculation when a direct answer can be obtained by asking a simple question." *Id.* at 172.  However, a conclusion that a prima facie case was shown only by showing that members of the defendant's race were removed from the jury would render the third step of the prima facie inquiry—the totality of the circumstances raises an inference that the strike was motivated by race—meaningless.  In *Johnson*, the totality of the circumstances indicated the Prosecution was removing all of the possible black jurors, which "looked suspicious." *Id.* at 173 (internal quotation omitted).  In the present case, it was reasonable to conclude that the totality of the circumstances did not raise a similar inference of racial discrimination.  Two of the three jurors who were struck had *obvious* reasons which would substantiate a peremptory challenge. Another, the trial court concluded was not "obviously Hispanic."  While best practices may indicate that the trial judge should have asked the prosecutor her reasons for striking the jurors in question, the Court of Appeal's determination that Petitioner failed to state a prima facie case is reasonable under the circumstances.  As such, Petitioner is not entitled to habeas relief on Claim I.

2.  Gang Enhancement Claims

In Claims II through VI, Petitioner raises various sufficiency of the evidence and challenges to the jury instructions with regard to the gang enhancement.

In 1988, California enacted the Street Terrorism Enforcement and Prevention Act ("STEP Act"). *People v. Gardeley*, 14 Cal. 4th 605, 615, 59 Cal. Rptr. 2d 356 (1997); *see* Cal. Penal Code § 186.20 et seq.  As relevant here, the STEP Act provides various sentence enhancements for crimes committed "for the benefit of, at the direction of, or in association with" a criminal street gang.  Cal. Penal Code § 186.22(b)(1).  The statute is not a modicum of clarity, and contains several moving parts.  Several of the statute's provisions require proof that the gang has been involved in what has been termed "predicate offenses," ranging from assault with a deadly weapon to grand theft and money laundering.  *Id.* § (e), (f); *see also Gardeley*, 14 Cal. 4th at 610

12

1  n. 1.  The term "predicate offenses" itself is a misnomer as the underlying felony for which the

2  defendant is being prosecuted can establish the predicate offense.  *People v. Sengpadychith*, 26

3  Cal. 4th 316, 323, 109 Cal. Rptr. 2d 851 (2001); *see Gardeley*, 14 Cal. 4th at 624.

4        California Penal Code § 186.22(b)(1) states that "any person who is convicted of a felony

5  committed for the benefit of, at the direction of, or in association with any *criminal street gang*,

6  with the specific intent to promote, further, or assist in any criminal conduct by gang members,

7  shall, upon conviction of that felony, in addition and consecutive to the punishment prescribed

8  for the felony or attempted felony of which he or she has been convicted . . . ." (emphasis added).

9  The statute then outlines the relevant punishments depending upon the nature of the felony.[6]

10  *See id.*

11        "Criminal street gang" is a term of art further defined by the statute as "any ongoing

12  organization, association, or group of three or more persons, whether formal or informal, having

13  one of its *primary activities* the commission of one or more of the criminal acts enumerated [in

14  subdivision (e) of the statute, the 'predicate offenses'] . . . and whose members individually or

15  collectively engage in or have engaged in a *pattern of criminal gang activity*." *Id.* § 186.22(f)

16  (emphasis added); *see also Gardeley*, 14 Cal. 4th at 617 ("[T]he prosecution must prove that the

17  gang (1) is an ongoing association of three or more persons with a common name or common

18  identifying symbol; (2) has as one of its primary activities the commission of one or more of the

19  criminal acts enumerated in the statute; and (3) includes members who either individually or

20  collectively have engaged in a 'pattern of criminal gang activity' by committing, attempting to

21  commit, or soliciting *two or more* of the enumerated offenses (the so-called 'predicate offenses')

22  during the statutorily defined period.").  "Pattern of criminal activity" is further defined as "the

23  commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained

24

25        [6] In Petitioner's case, the underlying felony of discharging a firearm at an occupied motor
26  vehicle resulted in a sentence of fifteen years to life in prison. *See* Cal. Penal Code §
   186.22(b)(4)(B).

1    juvenile petition for, or conviction of two" of the predicate offenses.[7] Cal. Penal Code §

2    186.22(e).

3           The California Court of Appeal, in addressing all of Petitioner's claims that relate to the

4    gang enhancement, determined as follows:

> ### *Evidentiary and Instructional Issues Regarding the Gang Enhancement*
>
> Defendants raise several contentions alleging the evidence and the instructions are insufficient regarding the gang enhancement. Pursuant to the gang enhancement statute (§ 186.22), this enhancement applies when a felony is committed on behalf of a "criminal street gang." (*Id.*, subd. (b)(1).) The jury found that defendants committed the felony offense of shooting into the occupied vehicle (§ 246) on behalf of the Sureños, a criminal street gang.
>
> A "criminal street gang" is defined in section 186.22, as relevant here, in terms of the group's "*primary activities*" and its members' "*pattern of criminal gang activity.*" (§ 186.22, subds.(f), (e), respectively, italics added.) And the concept of on behalf of a "criminal street gang" involves whether the charged offense was done for the "*benefit of*" the gang with the "*specific intent*" to promote criminal conduct by gang members. (§ 186.22, subd. (b)(1), italics added.) Defendant's contentions track these italicized elements. So will our analysis. We start with "primary activities."
>
> *Primary Activities*
>
> Defendants contend there is insufficient evidence to establish this element of "criminal street gang" in the context of the trial court's instruction on that element. We disagree.
>
> Specifically, section 186.22, subdivision (f), defines " 'criminal street gang' " as: (1) any ongoing, formal or informal group of at least three persons with some identifying commonality; (2) having "as one of its primary activities the commission of one or more of ... [currently 28] criminal acts [offenses] enumerated" in subdivision (e); and (3) "whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." (As we explain later, this pattern element also uses the criminal offenses enumerated in subdivision (e).)

---

[7] Currently, there are 33 possible predicate offenses which substantiate finding a "pattern of criminal gang activity." Cal. Penal Code § 186.22(e). Twenty-eight of these predicate offenses may support a finding of the criminal street gang's primary activities. *Id.* § 186.22(f).

Among the 28 (primary activity) offenses enumerated in subdivision (e) are: assault with a deadly weapon (§ 245); discharging a firearm from a motor vehicle (§ 12034); and shooting at an occupied motor vehicle (§ 246). (See § 186.22, subd. (e)(1), (e)(6), (e)(5), respectively.)

The trial court instructed the jury, as to the element of "primary activit [ies]," that a criminal street gang in the present case must have "as one or more of its primary activities, the commission of assault with a firearm or discharging or permitting the discharge of a firearm from a motor vehicle."

The evidence of primary activities came in three ways. First, Detective R. detailed the facts of two prior offenses, one that occurred on September 7, 2003, and the other on December 3, 2003. In the September 7 offense, Herardo Rodriguez, a validated Sureños gang member, fired four or five shots from a car at an individual who was walking near the Howe Park area claimed by a Sureños subset. The individual had apparently replied unfavorably to a question from a car occupant, and this cost him a bullet in the arm. As for the December 3 offense, a verbal confrontation ensued between a couple of individuals walking on a street in South Sacramento and a car containing numerous occupants, including Pancho Bettencourt, a validated Sureños gang member. Bettencourt fired numerous shots at the individuals, injuring one of them. Second, Detective R. opined that the primary activities of the Sureños street gang included "vandalism and theft and possession of drugs up to ... car theft, robbery, *felonious assault* and murder." (Italics added.) (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 324 (*Sengpadychith*) [expert testimony may be used to establish the primary activities element].)

And third, there is the present offense of shooting at an occupied motor vehicle. (§§ 186.22, subd. (e)(5), 246; *Sengpadychith*, *supra*, 26 Cal.4th at p. 323 [evidence of past or present criminal acts listed in § 186.22, subd. (e), is admissible to establish the primary activities element].)

Defendants contend this evidence is insufficient to establish the element of primary activities because: (1) Detective R.'s testimony regarding the two prior offenses concerned the element of "pattern of criminal gang activity" rather than the element of "primary activities"; (2) Detective R.'s opinion stated "'felonious assault'" as a primary activity, rather than any primary activity offenses enumerated in section 186.22, subdivision (e), and rather than the two offenses specified in the trial court's instruction on primary activities (i.e., firearm assault or firearm discharge from vehicle); and (3) the instruction on primary activities precluded the jury from considering the present offense as a primary activity. We disagree with each of these arguments.

15

Detective R.'s testimony about the two prior offenses-both of which involved Sureños shooting from a car and injuring their victims-constituted sufficient evidence of both assault with a firearm and discharge of a firearm from a vehicle, in line with the trial court's instruction on the element of primary activities.

Defendants argue, though, that the evidence of these two prior offenses was presented in the context of "pattern of criminal gang activity" rather than in the context of "primary activities." Defendants have sliced the elements of "primary activities" and "pattern of criminal gang activity" too finely here for three reasons. First, both elements here rely on the same prior (predicate) offenses; the record does not distinguish between these two elements in this way. (See § 186.22, subds. (e)(1), (e)(5), (e)(6) & (f).) Second, under section 186.22, "primary activities" is defined as involving the commission of one or more of 28 (predicate) offenses enumerated in subdivision (e), while "'pattern of criminal gang activity'" is defined as involving the commission of two or more of these 28 (predicate) offenses (subdivision (e) enumerates an additional five offenses available for the pattern element). (See § 186.22, subds. (f), (e).) And third, given this close statutory relationship between these two elements, as well as common sense, a criminal gang's primary activity will also generally encompass its pattern of criminal gang activity. (See § 186.22, subds. (a)(1), (a)(5), (a)(6), (e), (f).)

As for their second point, defendants question Detective R.'s opinion of "felonious assault" as a primary activity of the Sureños street gang. They note that "felonious assault" is not an offense enumerated in section 186.22, subdivision (e), as a primary activities offense, nor an offense listed within the trial court's instruction on the "primary activities" element here (i.e., the offenses of assault with a firearm and discharge of a firearm from a car). However, jurors reasonably could have evaluated Detective R.'s opinion on "felonious assault" in light of the detective's testimony detailing the two prior Sureño shooting offenses, which were offenses enumerated in subdivision (e) and within the trial court's instruction on the "primary activities" element (i.e., the offenses of assault with a firearm (§ 245) and firearm discharge from a vehicle (§ 12034)). (§ 186.22, subd. (e)(6).)

Defendants counter, however, that "assault with a firearm," which, as noted, is one of the two offenses listed in the trial court's instruction on primary activity offenses, is not enumerated as a primary activity offense in section 186.22, subdivision (e). (See § 186.22, subd. (f).) While "assault with a firearm" may not be specifically enumerated in the statute, "[a]ssault with a deadly weapon" is, and assault with a firearm is certainly assault with a deadly weapon in this context. (See § 186.22, subd. (e)(1), § 245, subd. (a)(1), (a)(2); *People v. Maldonado* (2005) 134 Cal.App.4th 627, 635 [assault with a deadly weapon includes assault with a firearm for purposes of § 186.22, subd. (e)(1) ].)

16

That leaves defendants' third point. Defendants assert that the trial court's instruction on primary activity offenses (limited to firearm assault and firearm discharge from a vehicle) precluded the jury from considering the present offense (shooting at an occupied vehicle, § 246) as a primary activity. But the jury reasonably could have deemed the current offense to also be an assault with a firearm (i.e., within the trial court's instruction on "primary activities," and within the relevant enumerated statutory offense of assault with a deadly weapon, § 186.22, subd. (e)(1)). In fact, the trial court additionally instructed the jury on the element of primary activities that "[i]f you find the defendant guilty of a crime in this case, you may consider that crime in deciding whether one of the group's primary activities was commission of that crime[.]" (Italics added.)

We conclude there is sufficient evidence of the element of primary activities in the context of the trial court's instruction on that element. In addition to the evidence of primary activities involving the two prior offenses, there is Detective R.'s supported expert opinion on primary activities as well as the current offense of shooting at an occupied vehicle.

Our resolution of this issue also dispenses with the following related argument from defendants: the jury must have failed to follow the trial court's instruction on primary activities because the jury found this element true notwithstanding the insufficiency of the evidence to support it.

*Pattern of Criminal Gang Activity*

Defendants raise two contentions as to this element, one evidentiary and the other instructional. We disagree with both.

First, the evidentiary claim. Defendants claim that Detective R.'s testimony detailing the two prior offenses involving Sureño shootings is insufficient because Detective R. stated that the two Sureños involved (Rodriguez and Bettencourt) were "both convicted of various offenses." Defendants explain that if the two Sureños "were convicted of something, any proof less than what the convictions were for necessarily fails to establish a predicate offense." We are unpersuaded.

A "pattern of criminal gang activity" does not require "convictions" because the statutory definition of this phrase includes "the commission of, attempted commission of," or "conviction of" the offenses. (§ 186.22, subd. (e).) A similar issue involving predicate offenses was involved in *In re I.M.* (2005) 125 Cal.App.4th 1195. There, the court concluded that " being prosecuted [for the predicate offense] permits the conclusion that there was significant evidence that [the gang member] had in fact

17

committed the offense." (*Id.* at p. 1208, italics added.) If "being prosecuted" constitutes sufficient evidence of commission, being "convicted of various offenses" certainly does too.

Now we turn to defendants' instructional claim. They contend that the trial court's limiting instruction on considering the evidence of gang activity precluded the jury from considering the evidence of the two prior offenses involving the Sureño shootings on the element of a "pattern of criminal gang activity." This argument is too clever by half.

The instruction at issue told the jurors that they could consider evidence of gang activity, among other limited purposes, "when you consider the facts and information relied on by an expert witness in reaching his opinion. You may not consider this evidence for any other purpose. You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime."

Defendants maintain the jury "was not authorized under [this] instruction to find a pattern of criminal gang activity based on [Detective R.'s] testimony concerning the two predicate offenses because the evidence was not to be considered for that purpose. It was only to be considered as it bore on [R.'s] opinion or for other limited purposes not applicable here."

As defendants note, Detective R. did not opine as an expert on the "pattern of criminal gang activity." Nor is this element all that amenable to expert testimony. (§ 186.22, subd. (e).) Instead, Detective R. simply tallied the offenses that prosaically added up to such a pattern. The evaluation of an expert's opinion, then, was not at issue when the jury considered Detective R.'s nonexpert testimony concerning this pattern. Consequently, the instruction, read in a manner that is as technical as the manner in which the defendants are reading it, was inapplicable. Moreover, the instruction also recognized, obliquely, that the charged gang enhancement would have to involve proof supplied by gang activity evidence, by stating that such evidence could be considered in deciding whether the "defendant acted with the intent, purpose, and knowledge that are required to prove the gang-related enhancement charged." And, fundamentally, how could the gang enhancement be proved other than with evidence of gang activity?

More specifically, the jury was also instructed fully on what constitutes a "pattern of criminal gang activity," including the commission of two or more firearm assaults and/or firearm discharges from a vehicle by gang member(s), the very evidence Detective R. provided for such a pattern. In any event, as we discussed in the preceding section of this opinion, Detective R.'s testimony about the two (predicate) Sureño shootings was admissible in the context of his expert opinion regarding the

18

1   "primary activities" of the Sureños street gang, and the evidence of
    "primary activities" and "pattern of criminal gang activity" are
2   inextricably intertwined here.

3   Our resolution of this issue also dispenses with the following
    related argument from defendants: the jury must have failed to
4   follow the trial court's instruction on the limited purposes of gang
    evidence because the jury found a pattern of criminal gang activity
5   notwithstanding these limitations.

6   *Benefit of and Specific Intent to Further Gang*

7   Defendants claim there is insufficient evidence that the shooting
    was committed for the benefit of a criminal street gang and with
8   the specific intent to promote or further any criminal conduct by
    gang members, as required by the gang enhancement statute. (§
9   186.22, subd. (b)(1).) Again, we disagree.

10  Detective R. opined that the shooting by defendants benefitted the
    Sureños gang by instilling fear and respect in the public, and had
11  the potential to enhance the status of defendants within the gang.
    The detective had several reasons for this opinion: the public
12  nature of the crime, involving a shooting, could be witnessed by
    numerous people; defendants' willingness to confront an armed
13  individual rather than try to avoid the confrontation; and the fact
    the victim did not report the shooting, all of which are
14  characteristic of gang behavior.

15  Defendants acknowledge Detective R.'s opinion, but argue that an
    "expert's testimony alone [is] not ... sufficient to find the ... offense
16  was gang related." (*People v. Ferraez* (2003) 112 Cal.App.4th 925,
    931; *In re Frank S.* (2006) 141 Cal.App.4th 1192, 1198-1199.)
17  Defendants maintain that gang membership was "strictly
    coincidental" here: Vicente merely acted "spontaneously" after the
18  Ford driver brandished a gun at Vicente's brother, Tomas.

19  That may be one way of viewing the evidence. But it is certainly
    not the only way. And it was the jury's call on what the evidence
20  showed, not our call. Defendants' own argument concedes the
    strength of Detective R.'s opinion and of the evidence of
21  defendants' gang membership. In addition, the defendants sported
    gang-style haircuts and wore gang-related clothing during the
22  commission of the crime (Tomas was wearing a blue belt while
    Vicente was attired in an Oakland Raiders sweatshirt, both
23  emblematic of the Sureños street gang). The incident, moreover,
    occurred in a manner that did not suggest spontaneity, but instead a
24  coordinated response to an affront that may have begun prior to the
    parking lot activity. The defendants' Camaro was parked facing
25  forward with its rear license plate flipped so it could not be seen by
    the Sidewalk Pizza patrons. Unarmed himself, Tomas continued to
26  hassle and essentially attack the armed victim, while Vicente

                              19

1  retrieved the gun from the Camaro, snuck up on the Ford, and fired
2  multiple shots into the Ford. And defendants had the presence of
   mind to apparently retrieve the spent casings from the shooting
3  site.

4  Slip Op. at 10-20.

5          a. Claim II

6       In Claim II, Petitioner argues that there was insufficient evidence to support the jury's

7  finding that a "criminal street gang" existed because there was insufficient evidence that one of

8  the organization's primary activities is the commission of one or more of the predicate offenses.

9       The Due Process Clause of the Fourteenth Amendment "protects the accused against

10 conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the

11 crime for with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970).  There is

12 sufficient evidence to support a conviction, if "after viewing the evidence in the light most

13 favorable to the prosecution, any rational trier of fact could have found the essential elements of

14 the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  "[T]he

15 dispositive question under *Jackson* is 'whether the record evidence could reasonably support a

16 finding of guilt beyond a reasonable doubt.'"  *Chein v. Shumsky*, 373 F.3d 978, 982 (9th Cir.

17 2004) (quoting *Jackson*, 443 U.S. at 318).  A petitioner for writ of habeas corpus "faces a heavy

18 burden when challenging the sufficiency of the evidence used to obtain a state conviction on

19 federal due process grounds." *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005).

20      A federal habeas court determines the sufficiency of the evidence in reference to the

21 substantive elements of the criminal offense as defined by state law.  *See Jackson*, 443 U.S. at

22 324 n. 16.  As set forth above, a "criminal street gang" is defined as "any ongoing organization,

23 association, or group of three or more persons, whether formal or informal, *having one of its*

24 *primary activities the commission of one or more of the criminal acts* enumerated [in subdivision

25 (e) of the statute, the 'predicate offenses'] . . . and whose members individually or collectively

26 engage in or have engaged in a pattern of criminal gang activity." *Id.* § 186.22(f) (emphasis

1    added).  Thus, in order for the jury to conclude that a criminal street gang existed, evidence must

2    have been presented that one of the group's primary activities is one of the enumerated felonies

3    listed in subdivision (e) of the statute.  Such evidence exists in the record.

4           At Petitioner's trial, a gang expert, referred to by the Court of Appeal as "Detective R.,"

5    testified about the activities of the Surenos gang, of which Petitioner was alleged to be a member.

6    Under California law, the expert testimony of a detective specializing in gangs can be used to

7    establish the necessary predicate offenses.  *See Gardeley*, 14 Cal. 4th at 617-20.  Detective R.

8    testified about two previous incidents involving the Sureno gang.  One occurred on September 7,

9    2003, and the other on December 3, 2003.  In the September 7 offense, Herardo Rodriguez, a

10   validated Surenos gang member, fired four or five shots from a car at an individual who was

11   walking near the Howe Park area claimed by a Surenos subset.  Rep.'s Tr. at 835.  Someone from

12   the car had asked the individual whether he was from the area.  The individual's reply caused

13   him to be shot in the arm.  *Id.*  In the December 3 offense, a verbal confrontation ensued between

14   a couple of individuals walking on a street in South Sacramento and a car containing numerous

15   occupants, including Pancho Bettencourt, a validated Surenos gang member.  Bettencourt fired

16   numerous shots at the individuals, injuring one of them.  *Id.* at 833-34.  Furthermore, when

17   Detective R. was asked for his opinion regarding "the primary activities of the Sureno street

18   gang" Detective R. opined: "They include, but are not limited to, crimes that are fairly minor in

19   nature like vandalism and theft and possession of drugs up to a car theft, robbery, felonious

20   assault and murder." *Id.* at 811.  There is also the evidence of the underlying offense in this case,

21    discharging a firearm at an occupied motor vehicle, as set forth by the two eye witnesses who

22   saw the shooting take place.

23          There was ample evidence from which the jury could conclude Petitioner was the

24   member of a group that had performed the requisite predicate offense to be a criminal street gang

25   under California law.  Amongst the enumerated felonies are discharging or permitting the

26   discharge of a firearm from a motor vehicle (Cal. Penal Code § 12034) and shooting at an

1  occupied motor vehicle (*Id.* § 246).  *Id.* § 186.22(e).  The later being the underlying felony in

2  Petitioner's case.  Through Detective R.'s testimony, the jury was informed of at least two prior

3  incidents in which members of the Sureno gang had shot from a motor vehicle.  The fact that

4  Detective R. did not specifically testify that this was a primary activity of the gang did not

5  prevent the jury from making such a finding.  The jury also heard testimony regarding the

6  underlying felony from eyewitnesses and was free to conclude Petitioner's acts were a primary

7  activity of the gang.  As such, viewing the record in the light most favorable to the prosecution,

8  there is sufficient evidence in the record to substantiate a finding that Petitioner was a member of

9  a criminal street gang as it is defined by California law.  Petitioner is not entitled to relief on this

10  claim.

11                          b.  Claim III

12          Claim III is directly related to Claim II.  Petitioner argues that while their may have been

13  sufficient evidence in the record from which a jury could conclude the primary activities of the

14  gang involved one on the predicate offenses, the trial court's instructions to the jury limited the

15  possible offenses which could be used as a predicate offense and no evidence of those offenses

16  exists in the record.  This claim lacks merit.  The jury was instructed, in relevant part, that a

17  criminal street gang "has, as one or more of its primary activities, the commission of assault with

18  a firearm or discharging or permitting the discharge of a firearm from a motor vehicle."  Clerk's

19  Tr. at 403; Rep.'s Tr. at 1432-33.  While this may have precluded the underlying felony of

20  shooting at an occupied vehicle from being considered as a primary activity (the Court of Appeal

21

22

23

24

25

26

1  found to the contrary[8]), it specifically included discharging a firearm from a motor vehicle.[9]  As

2  discussed above in Claim II, Through Detective R.'s testimony, the jury heard about two

3  previous incidents in which members of the Sureno gang had fired at individuals from inside a

4  vehicle.  Thus, the Court of Appeal was reasonable when it determined the jury still had ample

5  evidence from which it could conclude that one of the primary activities of the Sureno gang was

6  one of the predicate offenses provided in the jury instruction.  As such, Petitioner is not entitled

7  to relief on this claim.

8           c.  Claim IV

9           In Claim IV, Petitioner asserts that there was insufficient evidence of two predicate

10  offenses required for a jury to find a "pattern of criminal gang activity" which is a prerequisite to

11  a finding that a group is a criminal street gang.  Not only must a criminal street gang have as one

12  of its primary activities one of the predicate offenses found in § 186.22(e), as discussed above in

13  Claims II and III, the group's members must also "individually or collectively engage in or have

14  engaged in a pattern of criminal gang activity." Cal. Penal Code § 186.22(f).  "Pattern of criminal

15  activity" is further defined as "the commission of, attempted commission of, conspiracy to

16  commit, or solicitation of, sustained juvenile petition for, or conviction of two" of the predicate

17  offenses required for a finding of a "criminal street gang." *Id.* § 186.22(e).  Petitioner contends

18  that while the gang expert, Detective R., testified about two previous incidents in which a

19  member of the Sureno gang fired a weapon from a vehicle, a predicate offense, insufficient

20

21  _____

22  [8]  The jury was also instructed that it "could consider [the underlying felony] in deciding
     whether one of the group's primary activities was commission of that crime and whether a
23  pattern of criminal gang activity has been proved."  Clerk's Tr. at 404.  This can be interpreted to
     allow the underlying felony to be considered in addition to the felonies enumerated earlier in the
24  instruction.  Because, viewing the evidence in the light most favorable to the prosecution, enough
     evidence exists of the primary activities of the gang without including the underlying offense, it
25  is unnecessary to reach this argument.

26  [9]  The jury was further instructed as to the elements of this crime and was free to
     determine from the facts presented by Detective R. that the elements had been met.  Clerk's Tr. at
     401.

1  evidence exists that the offenders in those crimes were actually convicted of the predicate

2  offenses.  The Court of Appeal determined, interpreting California law, that it is not necessary to

3  prove that the prosecution of the predicate offense actually resulted in a conviction of that

4  specific crime.  The Court of Appeal's interpretation of California law is binding on this court.

5  *See Jackson*, 443 U.S. at 324 n. 16; *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (per curiam)

6  ("We have repeatedly held that a state court's interpretation of state law, including one

7  announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas

8  corpus." (citations omitted)).  This is a reasonable reading of the statute, considering the

9  definition of pattern of criminal activity only requires the gang members to have committed the

10  offense, not necessarily be convicted of it.  *See* Cal. Penal Code § 186.22(e).

11         As discussed above, the prosecution's gang expert testified about two previous incidents

12  involving Sureno gang members discharging a firearm from a vehicle, a predicate offense for

13  finding the existence of a pattern of criminal activity.  As such, viewing the evidence in the light

14  most favorable to the prosecution, ample evidence exists in the record from which the jury could

15  have concluded that Petitioner was a member of a criminal street gang.  Petitioner is not entitled

16  to relief on this claim.

17              d.  Claim V

18         In Claim V, Petitioner asserts that a jury instruction relating to opinion testimony

19  precluded the Jury from using anything the gang expert testified to as evidence, thus precluding a

20  finding that Petitioner was a member of a criminal street gang.  The instruction in question reads

21  as follows:

22         You may consider evidence of gang activity only for the limited
           purpose of deciding whether:
23
24              • The defendant acted with the intent, purpose, and
                knowledge that are required to prove the gang-related
25              enhancement charged; or

26              • The defendant had a motive to commit the crime charged;
                or

24

1 • The defendant actually believed in the need to defend himself.

2

3 You may also consider this evidence when you evaluate the credibility or believability of a witness and when you consider the facts and information relied on by an expert witness in reaching his opinion.

4

5 You may not consider this evidence for any other purpose.  You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime.

6

7 Clerk's Tr. at 405; Rep.'s Tr. at 1434-35.

8       Petitioner's challenge to the jury instruction is without merit.  Not everything that

9 Detective R. testified about was gang related activity as defined by the rest of the jury

10 instructions and California statute.  Under California law, in order to establish a predicate offense

11 it is not necessary to prove that the offense was "gang related," *see Gardeley*, 14 Cal. 4th at 620-

12 24, only that the predicate offense was committed by a gang member.  *Id.*; *see* Cal. Penal Code §

13 186.22(e).  Thus, any commission of a predicate felony by a gang member, be it gang related or

14 not, is sufficient to find the commission of a predicate offense under California's statutory

15 scheme.  Detective R. provided the jury with two instances in which a member of the Sureno

16 gang committed a predicate offense, shooting from a motor vehicle.  Detective R. did not testify

17 that the shootings were gang related, but did testify that they were committed by gang members.

18 The purpose of the jury instruction is to prevent the jury from concluding Petitioner was a

19 criminal or of bad moral character simply due to his status as a gang member: it was not meant to

20 preclude any evidence of activity by gang members to be used to show the required predicate

21 offenses.  *See People v. Samaniego*, 172 Cal. App. 4th 1148, 1167-68, 91 Cal. Rptr. 3d 874

22 (2009); *People v. Williams* 16 Cal. 4th 153, 193, 66 Cal. Rptr. 2d 123, 940 P.2d 710 (1997).

23 Petitioner is not entitled to relief on this claim.

24 / / /

25 / / /

26 / / /

1          e.  Claim VI

2          In Claim VI, Petitioner challenges the sufficiency of the evidence that he had the specific

3    intent to promote, further, or assist in any criminal conduct by gang members.  Petitioner also

4    alleges there was insufficient evidence that the underlying felony was for the benefit of, at the

5    direction of, or in association with a criminal street gang.

6          As discussed above, when determining the sufficiency of the evidence a court must look

7    at the evidence in the light most favorable to the prosecution and with references to the

8    substantive elements of state law.  *Jackson*, 443 U.S. 307.  California Penal Code section

9    186.22(b)(1) provides that ". . . . any person who is convicted of a felony committed for the

10   benefit of, at the direction of, or in association with any criminal street gang, with the specific

11   intent to promote, further, or assist in any criminal conduct by gang members" shall face a

12   punishment in addition to that for the underlying felony.

13         There is ample evidence in the record through the testimony of the gang expert from

14   which the jury could conclude Petitioner committed the underlying felony for the benefit of and

15   in association with a criminal street gang.  When asked a hypothetical based on the fact s of

16   Petitioner's case, Detective R. opined that such a crime would benefit the Surenos gang.  Rep.'s

17   Tr. at 943.  By committing such a "brazen act" in a public place in front of numerous witnesses,

18   Detective R. continued, "such a violent act has the potential to instill fear into the community."

19   *Id*. at 944.  Instilling fear into the community, in turn, benefits the gang by allowing it to "operate

20   more efficiently on the streets."  *Id*.  Additionally, the underlying offense was committed by

21   Petitioner along with his brother and co-gang member, providing sufficient evidence for a finding

22   that the crime was committed in association with a criminal street gang.  Petitioner argues that

23   the crime was not gang related, but rather Petitioner was defending his brother who had been

24   threatened with a firearm.  As the Court of Appeal aptly stated: "That may be one way of viewing

25   the evidence.  But it is certainly not the only way."  Slip Op. at 20; *see also People v. Albillar*, 51

26   Cal. 4th 47, 62, 244 P.3d 1062, 199 Cal. Rptr. 3d 415 (2010) (rejecting a similar claim and

noting "to presume, as defendants urge, that family ties necessarily predominate over gang affiliation when gang members who are related commit crimes together would substantially eviscerate the gang enhancement").  As stated previously, this court must view the evidence in the light most favorable to the prosecution.  Doing so, Detective R.'s testimony supported the jury's finding that the underlying felony was committed either for the benefit of or in association with a criminal street gang.

Furthermore, the evidence supports a conclusion that Petitioner had the "specific intent to promote, further, or assist in any criminal conduct by gang members." Cal. Penal Code § 186.22(b)(1).  Recently, in *People v. Albillar*, the California Supreme Court had the opportunity to clarify what must be shown to support a conviction on this clause of the gang enhancement statute after lower California courts and the Ninth Circuit reached opposite conclusions. *Compare People v. Vazquez*, 178 Cal. App. 4th 347, 353-54, 100 Cal. Rptr. 3d 351 (2009) *with Garcia v. Carey*, 395 F.3d 1099 (9th Cir. 2005) *and Briceno v. Scribner*, 555 F.3d 1069 (9th Cir. 2009).  The California Supreme Court determined "if substantial evidence establishes that the defendant intended to and did commit the charged felony with known members of a gang, the jury may fairly infer that the defendant had the specific intent to promote, further or assist criminal conduct by those gang members." *Albillar.* 51 Cal. 4th at 68.  The California Supreme Court's determination regarding state law is binding on federal courts, regardless of previous Ninth Circuit authority interpreting the statute to the contrary.  *See Vernon v. City of Los Angeles*, 27 F.3d 1385, 1391 (9th Cir. 1994)  Here, evidence in the record supports a finding that both Petitioner and his co-defendant were members of the Sureno gang.  *See* Claims VII and VIII, *infra*.  There is also substantial evidence that the underlying felony was committed.  *See* Claim IX, *infra*.  Under California law this was enough to permit the jury to infer Petitioner had the specific intent to promote, further, or assist criminal conduct.

/ / /

/ / /

1    Because sufficient evidence appears in the record to support a finding that Petitioner

2    acted for the benefit of and in association with a gang, and that Petitioner acted with the specific

3    intent to promote, further or assist in any criminal conduct by the gang, Petitioner is not entitled

4    to habeas relief on this insufficiency of the evidence claim.

5        3.  Claims VII and VIII

6    In Claims VII and VIII Petitioner raises two challenges to the admission into evidence of

7    a statement he had made to Detective R. the month before the shooting at Sidewalk Pizza.  In this

8    statement, Petitioner admitted that he was a member of the Sureno gang.  Rep.'s Tr. at 815, 936.

9    In Claim VIII, Petitioner alleges that the statement was inadmissable under *Miranda v. Arizona*,

10   384 U.S. 436 (1966), as he was in custody but had not been read his *Miranda* rights before

11   admitting he was a member of the Sureno gang.  In Claim VII, Petitioner alleges that the trial

12   court's failure to give a jury instruction that Petitioner's statement must be viewed with caution

13   violated his right to Due Process under the Fourteenth Amendment.  The Court of Appeal,

14   assuming without deciding that Petitioner's constitutional rights had been violated, found the

15   error to be "harmless beyond a reasonable doubt."  Slip Op. at 23; *see Chapman v. California*,

16   386 U.S. 18, 24 (1967).

17   In the interests of judicial economy, this court will also assume without deciding that the

18   alleged errors violated Petitioner's constitutional rights.  When a petitioner seeks collateral relief

19   from a state-court judgment, a federal court employs a less stringent harmless error analysis,

20   whether the "error 'had substantial and injurious effect or influence in determining the jury's

21   verdict.'" *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*,

22   328 U.S. 750, 776 (1946)); *see Fry v. Pliler*, 551 U.S. 112 (2007) (holding that "in § 2254

23   proceedings a court must assess the prejudicial impact of constitutional error in a state-court

24   criminal trial under the 'substantial and injurious effect' standard set forth in *Brecht* . . . whether

25   or not the state appellate court recognized the error and reviewed it for harmlessness under . . .

26   *Chapman*").

1    Applying this standard to the present case, admitting Petitioner's statement that he was a

2  gang member and failing to give a jury instruction did not have a substantial and injurious effect

3  or influence in determining the jury's verdict.  After a careful review of the record, substantial

4  evidence exists from which the jury could have concluded Petitioner was a gang member

5  regardless of his admission to that effect.

6    Petitioner admits "[t]here is other evidence that Petitioner was affiliated with the

7  Surenos."  Pet'r's Pet. at 29.  Detective R. was shown a photograph in which Petitioner and

8  another person used their hands to make the number 13, which is associated with the Sureno

9  gang.  Rep.'s Tr. at 818.  The detective opined that this was a "gang-type photo."  *Id.*  Deputy

10  Travis, a Deputy Sheriff assigned as a bailiff at the Sacramento Superior Court, observed a large

11  S and U, about two feet tall, written on the wall in the holding cell in which Petitioner and his co-

12  defendant were being held.  *Id.* at 768, 774.  There were no other inmates in the holding cell.  *Id.*

13  at 768.  Later, when Travis walked by the holding cell again, an R had been added to the letters

14  on the wall, spelling SUR.  *Id.* at 769.  A photo of the graffiti was shown to the jury.  Later in the

15  trial, Detective R. opined that such graffiti was "most likely drawn or written by a Sureno gang

16  member."  *Id.* at 819.  During the trial, Detective R. was asked by the prosecutor to look at

17  Petitioner's left hand.  Detective R. observed the number 13 written in ink in the webbing of

18  Petitioner's hand.  *Id.* at 937.  Detective R. also testified that Petitioner had a shaved head, a

19  hairstyle that was common among Sureno gang members. *Id.* at 936.  Finally, when Detective R.

20  was asked for his opinion regarding whether Petitioner was a member of the Sureno gang at the

21  time of the shooting, Detective R. stated that his opinion was that Petitioner "was, in fact, a

22  Sureno gang member" at the time of the shooting.  *Id.* at 820.  Thus, substantial evidence in the

23  record shows that Petitioner was a member of the Sureno gang.  As such, Petitioner did not suffer

24  any actual prejudice through the admission of his statement that he was a gang member or the

25  failure of the trial court to give an instruction regarding the admission.  *See Brecht*, 507 U.S. at

26  637 (Under the *Brecht* test, "habeas petitioners may obtain plenary review of their constitutional

1   claims, but they are not entitled to habeas relief based on trial error unless they can establish that

2   it resulted in actual prejudice." (internal quotation marks and citations omitted)).

3       If any constitutional violations did occur with regard to Petitioner's statement that he was

4   a Sureno, the violations did not have a substantial and injurious effect or influence in determining

5   the jury's verdict.  Therefore, Petitioner is not entitled to habeas relief in either Claim VII or VIII.

6       4.  Claim IX

7       In Claim IX, Petitioner asserts that there was insufficient evidence to convict him of

8   discharging a firearm at an occupied motor vehicle.  Petitioner alleges that there is insufficient

9   evidence that Petitioner actually fired a firearm, arguing that the evidence does not show that

10  either (1) he actually had a firearm and not some other item, or (2) that it was Petitioner, and not

11  the person inside the vehicle, who had previously brandished a weapon, that fired the shots.  In

12  ruling on this claim, the California Court of Appeal found as follows:

13      Defendants contend the evidence is insufficient that the instrument
14      Vicente had was a firearm. We disagree.

15      Both of the witnesses to the shooting, J.J. and R.W., testified that
        Vicente had a handgun. J.J. saw Vicente pull the trigger just
16      outside the Ford, and he heard the gunshots. J.J. did not see any
        flashes, but did notice the gun kick back two or three times. R.W.
17      saw Vicente reach into the passenger window of the Ford (to about
        wrist level) with a gun in his hand, and heard two or three
18      gunshots. A criminalist testified that a gunshot residue test was
        consistent with Vicente having fired a gun, and Tomas flopped out
19      of the Camaro on its way out of the parking lot to grab items off
        the ground at the shooting site.

20      Defendants rely on the improbability of Vicente having missed the
        driver, and relatedly on the criminalist's additional testimony that
21      if Vicente had stuck his hand in a car window as R.W. testified and
        a bullet was fired by a person inside the car that passed very close
22      to Vicente's hand, that act could possibly account for the gunshot
        residue on Vicente's hand. One may equally wonder from
23      defendants' theorizing about the improbability of the driver
        missing Vicente. And who is to say that Vicente did miss? But
24      more importantly, defendants' argument turns the evidentiary
        sufficiency rule on its head: we are to review the evidence in the
25      light most favorable to the judgment, not in the light least
        favorable.

26

1   Slip Op. at 21-22.

2       The appropriate standard for determining the sufficiency of the evidence is set forth in

3   Claim II, *supra*.  A review of the record shows sufficient evidence from which the jury could find

4   Petitioner guilty of the offense of discharging a firearm at an occupied motor vehicle, California

5   Penal Code section 246.

6       As the prosecution's first witness, the Deputy District Attorney called whom the Court of

7   Appeal referred to as J.J. to the stand (his first and last initial).  On the evening of March 2, 2006,

8   J.J. was a patron of Sidewalk Pizza, located off of Power Inn Road in Sacramento, California.

9   Rep.'s Tr. at 169-70.  J.J. stepped outside the pizza parlor to have a cigarette.  *Id.* at 170.  He saw

10  a white Ford Thunderbird with a single Hispanic male drive by in the parking lot.  *Id.*  The man

11  in the T-Bird began "jawing" at another man, identified as Petitioner's co-defendant, who had

12  come from another car, a white IROC Camaro.  *Id.*  at 170-71.  J.J. saw the man in the T-Bird

13  pull out a gun.  *Id.* at 173.  Petitioner's co-defendant and the man in the T-Bird continued to

14  argue as J.J. observed Petitioner get out of the driver's side of the IROC.  *Id.* at 182.  J.J. saw

15  Petitioner open the hatchback of the IROC and retrieve a gun.  *Id.*  J.J. didn't know what kind of

16  gun it was, but knew that it was a gun: he described it as a pistol.  *Id.*  J.J. stated that he was

17  familiar with guns and knew the difference between a revolver and a semi-automatic.  When

18  asked if he could tell whether Petitioner had a revolver or a semi-automatic, J.J. stated: "I wasn't

19  sure what kind of gun it was.  I would think revolver." *Id.* at 183.  Defense counsel objected that

20  the answer was speculation and the trial judge sustained the objection, asking the prosecutor to

21  rephrase the question.  *Id.*  J.J. reiterated that he "couldn't tell" whether the gun was a revolver or

22  a semi-automatic.  *Id.* at 184.[10]  J.J. did indicate, however, that the gun had a long barrel,

23

24

25        [10]  On cross-examination defense counsel used a police report which recorded J.J. as
      making a statement that the gun was a semi-automatic to impeach his trial testimony that it was a
      revolver.  Rep.'s Tr. at 253.  This testimony tended to show that J.J. was not, in fact, sure what

26    type of gun it had been.  It did not tend to indicate that what J.J. saw was not a firearm of some
      variety.  *See id.* at 252-54.

approximately seven inches long.  *Id.* at 222-25.  J.J. watched as Petitioner "walked up to the back of the Ford" and "fired some shots in there"—two to three shots from about one to two feet away from the car.  *Id.* at 185-86, 265, 267.  J.J. testified that he did not see any muzzle flash, but that he saw Petitioner's hand move and pull the trigger as he heard the shots.  *Id.* at 264-66. Petitioner didn't place the gun into the car window, but was "at least a foot away from the car window when he shot."  *Id.* at 257.

The prosecution's second witness was Mr. R.W.  R.W. was an employee of Sidewalk Pizza and he was working the register at the pizza parlor the evening of the shooting.  *Id.* at 303-04.  The register was about two feet away from a window that faced the road, giving R.W. a clear view of the events that were to transpire.  *Id.* at 304.  Something being thrown at a car caught R.W.'s attention, and R.W. observed Petitioner's co-defendant in a verbal altercation with a man in a T-Bird.  *Id.* at 306, 310-11.  R.W. saw Petitioner exit the driver side of the IROC, then go to the back of the car where Petitioner obtained something from the trunk.  *Id.* at 311-12. Petitioner then moved towards the T-bird, put his hand in the window, and started shooting.  *Id.* at 314.  R.W. observed a gun in Petitioner's hand.  *Id.* at 314-15, 360.  R.W. testified that Petitioner's hand was "basically wrist level into the car."  *Id.* at 315.  Like J.J., R.W. heard two to three shots.  *Id.*; *see also id.* at 328.  R.W. did not see any flashes, but he heard the shots.  *Id.* at 362.  On cross-examination, R.W. described the gun: "From what I seen, it looked like a revolver, yes, like a Dirty Harry gun, had a long barrel," "The barrel was really long."  *Id.*

In addition to the eyewitness testimony of J.J. and R.W., the prosecution called Trevor Wilson, a criminalist specializing in gunshot residue.  *Id.* at 608-09.  Wilson testified that an analysis of particles found on Petitioner's hands "indicate[d] either the individual fired a weapon or was in the extreme near vicinity of a weapon being fired."  *Id.* at 624.

Viewing this evidence in the light most favorable to the prosecution, ample evidence exists that Petitioner fired a weapon at an occupied vehicle.  While J.J. and R.W.'s testimony regarding the firearm may not be totally consistent, they both said that the gun had a long barrel

1   and saw it fired into the vehicle.  J.J. specifically said that he saw Petitioner pull the trigger.  The

2   criminalist's testimony bolsters the testimony of the eyewitnesses by showing that Petitioner had

3   gunshot residue on his hands.  While Petitioner offers different theories regarding the events, that

4   he did not actually have a gun and that it was the person in the car who shot at him, the record

5   offered the jury sufficient evidence to find to the contrary.  So long as there is sufficient

6   evidence, the jury's verdict will not be disturbed.  Petitioner fails to meet his heavy burden to

7   warrant granting federal habeas relief on this insufficiency of the evidence argument.

8        5.  Claim X

9        In Claim X, Petitioner contends that the trial court should have sua sponte instructed the

10  jury on a lesser included offense: attempted discharge of a firearm at an occupied motor vehicle.

11  An application for writ of habeas corpus by a person in custody under judgment of a state court

12  can only be granted for violations of the Constitution or laws of the United States.  *See* 28 U.S.C.

13  § 2254(a).  Generally, in the Ninth Circuit, "[T]he failure of a state trial court to instruct on lesser

14  included offenses in non-capital cases does not present a federal constitutional question."

15  *Windham v. Merkle*, 163 F.3d 1092 (9th Cir. 1998) (citing *Turner v. Marshall*, 63 F.3d 807, 819

16  (9th Cir.1995), *overruled on other grounds by Tolbert v. Page*, 182 F.3d 677 (9th Cir.1999)); *see*

17  *Bashor v. Risley*, 730 F.2d 1228 (9th Cir.1984) (declining to extend the lesser included offense

18  rule in capital cases to non-capital cases)[11]; *Solis v. Garcia*, 219 F.3d 922, 928-30 (9th Cir. 2000).

19  However, "the defendant's right to adequate jury instructions on his or her theory of the case

20  _____

21      [11]  In 1980, the Supreme Court held that a defendant in a capital murder case has a
    constitutional right to have the jury instructed on a lesser included offense in certain instances.
22  *Beck v. Alabama*, 447 U.S. 625, 638 (1980).  The Supreme Court explained that when a jury is
    given only two options, "not guilty" and "guilty of capital murder," even though the evidence
23  would support an instruction on a lesser included offense, the risk that the jury will convict
    although it has reasonable doubt is too great and a third option, namely a lesser included,
24  non-capital offense instruction, is required.  *Id.*  In a footnote, the Court expressly reserved
    judgment on "whether the Due Process Clause would require the giving of such instructions in a
25  non-capital case."  *Id.* at 638 n. 14.  In the years following Beck, the Circuits split on the question
    of whether the holding in *Beck*, that due process requires lesser included offense instructions in
26  certain instances for capital defendants, applied to non-capital cases as well.  *See Solis*, 219 F.3d
    at 928-29.

1    might, in some cases, constitute an exception to the general rule." *Bashor*, 730 F.2d at 1240.

2           In *Solis*, the Ninth Circuit found its exception to the general rule barring consideration of

3    lesser included offense claims was not applicable where there was not substantial evidence to

4    support the defendant's theory of the case.  219 F.3d at 929.  Here, the Court of Appeal

5    concluded there was not substantial evidence to require the trial court to instruct on the lesser

6    included offense of attempt.  Slip Op. at 25-26.  That conclusion is reasonable.  The testimony of

7    both eyewitnesses indicated that Petitioner shot a gun into the vehicle.  While their testimony

8    about where exactly Petitioner's hand was located (either just inside or just outside the car

9    window) when he fired the shots may be inconsistent, both witnesses agreed it was Petitioner

10   who fired a weapon.  *See* Claim IX, *supra*.  No evidence was offered to the contrary by the

11   defense.  The defense relied on the fact that the person in the car had also been seen with a

12   weapon and the criminalist's opinion that the gun shot residue could also have been a result of

13   being near a weapon fired by someone else, but this ignores the fact that J.J. saw Petitioner

14   pulling the trigger.  As such, no exception to the rule that failure to instruct on a lesser included

15   offense is not a federal constitutional question exists in this case.

16          Furthermore, even if Petitioner could show substantial evidence of his version of the

17   facts, he would still not be entitled to relief.  Under AEDPA, the state court's determination must

18   be an "unreasonable application of clearly established federal law, *as determined by the Supreme*

19   *Court of the United States*." 28 § 2254(d)(1) (emphasis added).  The constitutional authority

20   which would support Petitioner may be "clearly established" federal law in this circuit, but

21   circuit authority alone does not support a federal court's grant of the writ under 28 U.S.C.

22   2254(d)(1).  *Clark v. Murphy*, 331 F.3d 1062, 1070-71 (9th Cir. 2003), *cert. denied*, 540 U.S.

23   968 (2003). Only "clearly established" Supreme Court authority will suffice.  *Id*.  In *Beck v.*

24   *Alabama*, 447 U.S. 625, 638 n. 14 (1980), the Supreme Court explicitly left open the question of

25   "whether the Due Process Clause would require the giving of [lesser included offense]

26   instructions in a noncapital case."  Without the Supreme Court directly addressing that question,

there is no clearly established federal law as determined by the Supreme Court to support

Petitioner's claim.

For the foregoing reasons, Petitioner is not entitled to federal habeas relief on this claim.

6. Claims XI and XII

In Claim XI, Petitioner asserts that his constitutional right to an impartial jury was

violated on two basis.  First, Petitioner argues that the jury's cumulative failure to follow the jury

instructions amounted to jury misconduct.  This claim presumes that the jury instructions be read

in the way Petitioner believes they should be read.  As Petitioner's direct claims to the jury

instructions should be denied, there can be no cumulative effect upon the jury and Petitioner is

not entitled to relief on the first prong of this claim.  Second, Petitioner argues that a specific

instance of jury misconduct—a juror speaking to R.W., one of the eyewitnesses—entitles him to

habeas relief.  In Claim XII, Petitioner finds error in the trial court's refusal to dismiss the juror.

In ruling on these claims, the California Court of Appeal found as follows:

> Vicente contends the trial court abused its discretion in failing to
> discharge juror No. 3 . . . . We find no abuse.
>
> Section 1089 authorizes a trial court to discharge a juror for
> inability to perform his or her duty. A trial court's decision to
> discharge, or not discharge, a juror under section 1089 is reviewed
> for abuse of discretion. (*People v. Ledesma* (2006) 39 Cal.4th 641,
> 743.) The juror's inability must appear in the record as a
> demonstrable reality. (*Ibid.*)
>
> As for juror No. 3, the record shows the following. During a break
> in the trial, witness R.W. approached juror No. 3, and the juror told
> R.W. he was not supposed to talk to him. Juror No. 3 did not
> engage in any more conversation, but R.W. continued to talk "a
> little bit about trivial things." Juror No. 3 unequivocally indicated
> that this contact would not affect his judgment in evaluating
> R.W.'s testimony. The record does not show a "demonstrable
> reality" of juror No. 3's inability to function.
>
> Additionally, Vicente contends that the incident involving juror
> No. 3 shows, once again, the jury's inability to follow instructions,
> here the instruction not to "speak to ... any of the witnesses." But
> juror No. 3 did not speak to R.W., other than to tell R.W. he could
> not do so. . . . We find no abuse of discretion.

1  Slip Op. at 26-27.

2       Initially, Juror No. 3 did not violate the trial court's admonition.  Defense counsel's

3  assistant, Ms. Berberick, observed R.W. speaking to Juror No. 3: "[R.W.] was outside smoking a

4  cigarette, talking to juror number 3.  Juror number 3 wasn't saying anything. [R.W.] was doing

5  all the talking.  Whether they were talking about the case, I have no idea." Rep.'s Tr. at 564.

6  Upon direct questioning by the court, Juror No. 3 said that R.W. made small talk with him and

7  that Juror No. 3 told R.W. "I'm not supposed to be talking." *Id.* at 567.  R.W. continued to make

8  small talk, but did not talk about the case.  *Id.*  Juror No. 3 did not believe that the contact would

9  affect his evaluation of R.W.'s testimony or judgment in any way.  *Id.*  The juror only spoke to

10  the witness to tell him he could not speak to him.

11       "[I]mpartial jurors are the cornerstone of our system of justice and central to the Sixth

12  Amendment's promise of a fair trial." *United States v. Dutkel*, 192 F.3d 893 (9th Cir. 1999).

13  However, "due process does not require a new trial every time a juror has been placed in a

14  potentially compromising situation. Were that the rule, few trials would be constitutionally

15  acceptable." *Smith v. Phillips*, 455 U.S. 209, 217 (1982).  "[I]t is virtually impossible to shield

16  jurors from every contact or influence that might theoretically affect their vote.  Due process

17  means a jury capable and willing to decide the case solely on the evidence before it, and a trial

18  judge ever watchful to prevent prejudicial occurrences and to determine the effect of such

19  occurrences when they happen." *Id.*  "[T]he remedy for allegations of juror partiality is a hearing

20  in which the defendant has the opportunity to prove actual bias." *Id.* at 215; *see Remmer v.*

21  *United States*, 347 U.S. 227 (1954); *Dennis v. United States*, 339 U.S. 162 (1950); *Chandler v.*

22  *Florida*, 449 U.S. 560 (1981); *see also United States v. English*, 92 F.3d 909 (9th Cir. 1996) ("To

23  obtain a new trial, the defendant must establish that actual prejudice resulted from an ex parte

24  contact with a juror." (citing *United States v. Madrid*, 842 F.2d 1090, 1093 (9th Cir. 1988), *cert.*

25  *denied*, 488 U.S. 912 (1988))).  When such a hearing is held, the state court's findings are

26  entitled to a presumption of correctness on federal habeas corpus review.  28 U.S.C. § 2254(d);

see *Tinsley v. Borg*, 895 F.2d 520, 524-25 (9th Cir. 1990).

Here, Petitioner was afforded an opportunity to show actual bias.  When R.W.'s conversation with Juror No. 3 was brought to the attention of the court, the judge questioned the witness to the encounter and then questioned Juror No. 3 about what happened.  The trial court was convinced that because the conversation was not about the case, the juror had told R.W. they were not supposed to speak, and the juror stated that it would not affect his judgment, that no prejudice had resulted from the conversation.  Rep.'s Tr. at 571.  Because the conversation was not related to the case, was brief, and the juror did not think it would affect his judgment in any way, the trial court's determination was reasonable under the circumstances.  As such, Petitioner is not entitled to relief on either Claim XI or XII.

## IV.  REQUEST FOR AN EVIDENTIARY HEARING

Finally, Petitioner requests an evidentiary hearing on his Claims.  (*See* Pet'r's Traverse at p. 4.)  A court presented with a request for an evidentiary hearing must first determine whether a factual basis exists in the record to support petitioner's claims, and if not, whether an evidentiary hearing "might be appropriate."  *Baja v. Ducharme*, 187 F.3d 1075, 1078 (9th Cir. 1999); *see also Earp v. Ornoski*, 431 F.3d 1158, 1166 (9th Cir. 2005).  A petitioner requesting an evidentiary hearing must also demonstrate that he has presented a "colorable claim for relief."  *Earp*, 431 F.3d at 1167 (citations omitted).  To show that a claim is "colorable," a petitioner is "required to allege specific facts which, if true, would entitle him to relief."  *Ortiz v. Stewart*, 149 F.3d 923, 934 (9th Cir. 1998) (internal quotation marks and citation omitted).  In this case, Petitioner's claims are readily determined by the record.  Petitioner has not alleged any additional facts that, if true, would entitle him to relief and, therefore, Petitioner fails to demonstrate that he has a colorable claim for federal habeas relief.  Moreover, the Supreme Court has recently held that federal habeas review under 28 U.S.C. § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits" and "that evidence introduced in federal court has no bearing on" such review.  *Cullen v. Pinholster*, __ U.S. __, 131 S.Ct. 1388, 1398,

1   1400 (2011).  Thus, his request will be denied.

2                              IV.  CONCLUSION

3          For all of the foregoing reasons, IT IS HEREBY RECOMMENDED that the petition for

4   writ of habeas corpus be DENIED.

5          These findings and recommendations are submitted to the United States District Judge

6   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days

7   after being served with these findings and recommendations, any party may file written objections

8   with the court and serve a copy on all parties.  Such a document should be captioned "Objections

9   to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be

10  served and filed within seven days after service of the objections.  The parties are advised that

11  failure to file objections within the specified time may waive the right to appeal the District

12  Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).  In any objections he elects to file,

13  Petitioner may address whether a certificate of appealability should issue in the event he elects to

14  file an appeal from the judgment in this case.  *See* Rule 11, Federal Rules Governing Section 2254

15  Cases (the district court must issue or deny a certificate of appealability when it enters a final

16  order adverse to the applicant).

17  DATED:  July 18, 2011

18

19

20

21

22                                           _____

23                                           TIMOTHY J BOMMER
                                             UNITED STATES MAGISTRATE JUDGE

24

25

26

                                              38